# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

JOHN CONNELL and LUCY CONNELL, )
                                               )
      Plaintiffs,                  )
                                                 )
VS.                                     )      No. 1-03-1012-T
                                                 )
WEBB REALTY, INC.; JULE NANCE; )
BILLY N. WEBB, JR.; ANNA WEBB; )
JAMES N. MAYS; KAY W. MAYS; and )
DIANNE MOORE,                   )
                                                 )
      Defendants.                )

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Plaintiffs John and Lucy Connell filed this action against Defendants Webb Realty, Inc., Jule Nance, Billy Webb, Jr., Anna Webb, James N. Mays, Kay W. Mays, and Dianne Moore alleging discrimination as prohibited by the Fair Housing Act ("FHA"), as amended 42 U.S.C. § 3601 *et seq.* Specifically, Plaintiffs, who are black, contend that they were discriminated against on account of their race while trying to purchase a home located at 1181 West Church Street in Alamo, Tennessee. On March 28, 29, and 30, 2005, the case was tried by the court, sitting without a jury. At the close of Plaintiffs' proof, the court granted judgment as a matter of law as to Defendants Anna Webb and Jule Nance because Plaintiffs did not object to dismissing Mrs. Webb from the case and the court found that Mr. Nance, the listing agent, was not involved in this matter other than to set up the appointment

116

for Plaintiffs to view the home. In that regard, the court found that Mr. Nance's failure to promptly return Plaintiffs' realtor's call was the result of his being busy rather than an intent to discriminate against Plaintiffs because of their race. At the close of all the evidence, the court took the matter under advisement. Based upon the evidence presented, the statements of counsel and the entire record, the court issues the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

<u>Background</u>

Mr. and Mrs. Connell were looking to purchase a home. On Thursday, January 25, 2001, Mrs. Connell saw a house for sale at 1181 West Church Street and called her real estate agent, Carolyn Lumpkin. Ms. Lumpkin attempted to contact the listing agent, Jule Nance of Webb Realty, but was unsuccessful. During this time she spoke to Anna Webb, an employee of Webb Realty, about contacting Mr. Nance. Ms. Lumpkin had difficulty reaching Mr. Nance, but ultimately the two were able to set an appointment for Mr. and Mrs. Connell to view the property at 2:00 p.m. on Saturday, January 27, 2001. Mr. Mays, the owner, would be home during the appointment.

Mr. and Mrs. Connell viewed the Mays' home on January 27th. During the appointment, Mr. Mays received a phone call from Dianne Moore, a real estate agent with Webb Realty and Plaintiffs' former realtor. She informed Mr. Mays that another couple who had viewed the home that morning, Mr. and Mrs. Fry, had offered to purchase the property for the full asking price of $70,000.00. Mr. Mays informed Ms. Lumpkin and Plaintiffs

about the offer. Ms. Lumpkin asked whether Plaintiffs could also make an offer and Mr. Mays agreed. During this time, in a context that is not entirely clear, Mr. Mays told Plaintiff that he was sorry and that "[t]his has nothing to do with you folks being black."

After they left the Mays' home, Ms. Lumpkin and Plaintiffs drew up a sales agreement offering $75,000.00 for the house. Ms. Lumplin delivered the contract to Mr. Mays. Mr. Mays then called Mrs. Moore, who in addition to being the Frys' realtor was also the Mays' neighbor and friend, to help him. Mr. Mays and Mrs. Moore opened the bids and discussed what he should do. Mr. Mays decided to give the Frys a chance to match Plaintiffs' offer. The Frys agreed to match the offer and the home was sold for $75,000.00 with an extended sixty (60) day closing. Plaintiffs then brought this suit alleging race discrimination in violation of the Fair Housing Act.

<u>Stipulation of Uncontested Facts</u>

Before trial, the parties stipulated to the following uncontested facts:

1. Plaintiffs are black and as such are members of a protected class under the FHA.
2. Carolyn Lumpkin, the real estate agent for Plaintiffs, is black.
3. James and Kay Mays, the sellers of the property at 1181 West Church Street, are white.
4. Billy Webb, Jr., Anna Webb, Jule Nance, and Dianne Moore are white.
5. The property at 1181 West Church Street was sold to Douglas and Joyce Fry, who are white.
6. In 2001, Mrs. Moore was an employee of Mr. Webb/Webb Realty Company.
7. In 2001, Mr. Nance and Mrs. Webb were employees of Mr. Webb/Webb Realty Company.
8. According to the "Exclusive Right to Sell Agreement" form, Mr. and Mrs. Mays listed their home at 1181 West Church Street for sale with Mr. Webb/Webb Realty on January 23, 2001, with Mr. Webb as broker and Mr.

Nance as agent.

9. Mr. Nance was the listing agent for the sellers, Mr. and Mrs. Mays.

10. The asking price for the house was $70,000.00.

11. Webb Realty did not have a key to the Mays' house.

12. Mr. and Mrs. Mays wanted the house shown by appointment because they had a dog in the house.

13. Mr. and Mrs. Fry saw the house together on Saturday, January 27, 2001, at 11:00 a.m.

14. The Sales Agreement indicates that Mr. and Mrs. Fry made their initial offer at 2:00pm on January 27, 2001.

15. The Sales Agreements indicates that the initial offer of Mr. and Mrs. Fry was for the full asking price of $70,000.00, with the date of possession being the date of closing.

16. On January 24, 2001, Mrs. Connell saw a house with a "For Sale" sign at 1181 West Church Street. The sign indicated that the house was listed with Webb Reality Company.

17. At approximately 9:00 a.m. on Friday, January 26, 2001, Ms. Lumpkin called Webb Reality to arrange for Plaintiffs to see the house at 1181 West Church Street.

18. Mrs. Webb called Ms. Lumpkin and gave her two or three numbers for Mr. Nance. Ms. Lumpkin called Mrs. Webb back and got another number for Mr. Nance.

19. When Mr. Nance was contacted by Ms. Lumpkin about arranging a showing for Plaintiffs, Ms. Lumpkin did not tell Mr. Nance the names of her clients.

20. Mrs. Webb was not involved in showing the house except to the extent that she contacted Mr. Nance to arrange for him to call Ms. Lumpkin and schedule a showing and to the extent that she gave Mr. Nance's number to Ms. Lumpkin.

21. Plaintiffs saw the house on Saturday, January 27, 2001, at approximately 2:00 p.m.

22. While Plaintiffs were seeing the Mays' house, Mr. Mays received a telephone call from Mrs. Moore.

23. Mr. Mays was told that Mrs. Moore had an offer for the house.

24. Mr. Mays made Plaintiffs' real estate agent, Ms. Lumpkin, aware of the fact that an offer had been made on the house.

25. Plaintiffs made an offer on Saturday, January 27, 2001, at 2:55 p.m.

26. Ms. Lumpkin did not tell Mr. or Mrs. Webb that she put the offer in the mailbox at Webb Realty.

27. Mr. Mays knew that Plaintiffs were black because he was at the home when Plaintiffs viewed the house. Mr. Mays never met the Plaintiffs prior to the

house being sold.

## Contested Issues of Facts

In a joint pre-trial order, the parties agreed that there were three contested issues of facts:

1. Whether Defendants' refusal to sell, show, negotiate for the sale of, denial of, availability of, and application of different terms and conditions to the sale of the home at 1181 West Church Street were because of Plaintiffs' race.
2. Whether Defendants interfered with Plaintiffs' right to purchase the house located at 1181 West Church Street because of Plaintiffs' race.
3. What amount of damages, if any, Plaintiffs are entitled to recover.

## Contested Issue of Law

In the pre-trial order, the parties agreed that the following were contested issues of law:

1. Whether Plaintiffs can prove a *prima facie* case of race-based discrimination on the part of Defendants in violation of The Fair Housing Act of 1968, 42 U.S.C. § 3604(a), (b), and (d), as amended, refusal to sell, refusal to show, refusal to negotiate for, interference with the right to purchase, application of different terms and conditions to, and denial of availability with respect to the subject property.
2. If Plaintiff can establish a *prima facie* case of discrimination based on race, whether Defendants have articulated a legitimate, nondiscriminatory reason for the 1181 West Church Street property having been sold to someone other than Plaintiffs, and if so, whether Plaintiffs have proved that the reason articulated by Defendants is a mere pretext.
3. Whether an agency relationship, either actual or apparent, existed among Defendants.

5

Findings of Fact and Conclusions of Law

I.       Whether an agency relationship, either actual or apparent, existed among Defendants.

A. Mrs. Moore as an agent for Billy Webb, Jr., and Webb Realty.

The Fair Housing Act forbids prohibited acts by "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate... because of race...."  42 U.S.C. §§ 3605(a).  It adds that a "[p]erson" under the statute includes individuals, corporations, unincorporated organizations, partnerships, associations, and other organizations.  §§ 3602(d).[1]  While not specifically mentioned, "it is well established that the Act provides for vicarious liability.  The [Supreme] Court has noted that an action brought for compensation by a victim of housing discrimination is, in effect, a tort action."  Meyer, 537 U.S. at 285 (referencing Curtis v. Loether, 415 U.S. 189, 195-96 (1974)).  Under traditional vicarious liability rules, principals or employers are "vicariously liable for acts of their agents or employees in the scope of their authority or employment."  Id.  Thus, employers are held vicariously liable for acts of their agents or employees that violate the FHA.  Id.

During trial, the parties stipulated that at the time of the alleged FHA violation, Mrs. Moore was acting as an agent with Webb Realty.  Tr. at 285.  Thus, if a violation occurred, Webb Realty and Mr. Webb are vicariously liable for the acts of its/his agent and employee,

---

[1] Billy Webb, Jr. testified that, at the time of the alleged FHA violation, Webb Realty was a sole proprietorship but that it became a limited liability company as a result of this action.  Tr. at 276, 280. Section 3602(d) of the statute includes a sole proprietorship as a "person" liable under the FHA.

6

Mrs. Moore.

B. Mrs. Moore as an agent of Mr. and Mrs. Mays.

Plaintiffs argue that Mrs. Moore was acting as an agent of Mr. and Mrs. Mays when she came to their house on Saturday, January 27, 2001, to help Mr. Mays open the competing offers and discuss his options.  As a result, Plaintiffs argue, Mr. and Mrs. Mays are liable for any discriminatory acts by Mrs. Moore.  Defendants counter that Mrs. Moore was not acting as an agent for the Mays because the Mays had entered an agent relationship with Mr. Nance, their realtor.  Further, they contend that she only told Mr. Mays what he could do in this situation but that Mr. Mays made the final decision.  Finally, Defendants argue that Mr. Mays called Mrs. Moore because she was his neighbor and his friend, and that his call was not an attempt to create an agent-principal relationship with her.

The discriminatory conduct of a real estate agent, "'is as a general rule, attributable to the owner... both under the doctrine of respondeat superior and because of the duty to obey the law is non-delegable.'" Marr v. Rife, 503 F.2d 735, 741 (6th Cir. 1974) (quoting United States v. Youritan Construction Co., 370 F.Supp. 643 (N.D.Cal. 1973)).  Therefore, the acts and statements of a real estate agent, made while within the scope of their agency, are attributable to the home owner.  Id.  Here, the issue is whether Mrs. Moore was acting as an agent for the Mays when the alleged FHA violation occurred.

The question of whether an agency relationship exists for the purpose of the FHA is determined under federal law, not state law. Marr, 503 F.2d at 740.  In determining whether

an agency relationship exists, courts generally look to the definition of "agency" provided by the Restatement (Second) of Agency (1958) ("the Restatement").  See e.g., General Building Contractors Assn. V. Pennsylvania, 458 U.S. 375 (1982) (applying the Restatement to analysis of similar civil rights action under 42 U.S.C. §§ 1981).  Under the Restatement, agency results from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." Restatement (Second) of Agency, §§ 1.  Vicarious liability may rest upon the existence of either an actual or an apparent agency relationship.   Inland Mediation Bd. v. City of Pomona, 158 F.Supp.2d 1120, 1140 (C.D.Cal. 2001); Marya v. Slakey, 190 F.Supp.2d 95, 101 (D.Mass. 2001).  Actual agency exists where: (a) a principal manifests to another that the other has authority to act on the principal's behalf and subject to the principal's control; and (b) the other, or agent, consents to act on his principal's behalf and subject to the principal's control. See In re Shulman Transport Enterprises, Inc., 744 F.2d 293, 295 (2d Cir. 1984).  In addition, HUD has promulgated its own definition of "agency" which parallels the Restatement definition, and to which federal courts afford "considerable deference." Holley v. Crank, 258 F.3d 1127, 1130 (9th Cir. 2001); Marya, 190 F.Supp.2d at 100.  HUD defines a broker or agent as "any person authorized to perform an action on behalf of another person regarding any matter related to the sale or rental of dwellings, including offers, solicitations, or contracts and the administration of matters regarding such offers, solicitations or contracts or any residential real estate-related transaction." 24 C.F.R.

§ 100.20.

In the present case, clearly an actual agency relationship, as defined by the Restatement and the HUD regulations, did not exist because Mr. and Mrs. Mays had entered into an expressed agreement with Mr. Nance to be the listing agent for their property. Ex. 7, 8. Plaintiffs offered no evidence of any actual agreement between Mrs. Moore and the Mays. Therefore, Mr. and Mrs. Mays may only be liable if an apparent agency relationship existed with Mrs. Moore.

Apparent agency "can be created by... conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him to so act on the principal's account." Restatement (Second) of Agency §§ 26. To find apparent agency, courts look to the "actual conduct of the parties and regardless of written or other specific authority negativing or limiting the existence of agency."[2] Barefoot v. Int'l B'Hood of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., 424 F.2d 101, 104-05 (10th Cir. 1970).

In the present case, Mr. Mays testified that he called Mrs. Moore after he received Plaintiffs' offer from Ms. Lumpkin and asked her to come over. Tr. at 178. When Mrs. Moore arrived, Mr. Mays asked what the proper procedure was and what his options were. Tr. at 179, see also tr. at 397. Mr. Mays stated that "she gave me an option. You know, she

---

[2] This is because "[a]gency is a legal concept which depends on the manifest conduct of the parties, not on their intentions or beliefs as to what they have done." Interocean Shipping Co. v. Nat'l Shipping and Trading Corp., 523 F.2d 527, 537 (2d Cir. 1975).

9

said that I could go back to the Frys and see if they would want to up their price since they had already asked–I mean already offered the full amount for the house, the listing price, and–or I could reject them or whatever, you know, I wanted to do." Tr. at 179; see also tr. at 371, 373-74. Mr. Mays did not think that Mrs. Moore was giving him advice as to what he should so, but rather, she was telling him the proper procedure. Tr. at 181. After Mr. Mays decided to give the Frys a chance to counteroffer, he told Mrs. Moore to call the Frys and see if they would offer $75,000.00. Tr. at 181. Mrs. Moore stated that she "told [the Frys] that another couple had made an offer for seventy-five, and did they want to come up to seventy-five, or did they want out of the deal."[3] Tr. at 372. The Frys told Mrs. Moore that they wanted to think about it. Tr. at 182, 372. They called back and told Mrs. Moore that they would meet Plaintiffs' offer. Tr. at 182, 372. Mr. Mays testified that at no point during this time did Mrs. Moore instruct him to reject an offer from Plaintiffs. Tr. at 195.

Upon consideration of the evidence, the court finds that Mrs. Moore did not act as the apparent agent of the Mays. Mrs. Moore answered Mr. Mays' questions regarding the proper procedure and the options available to him under the circumstances, but she did not instruct him to take any particular course of action. In this regard, she acted more like a facilitator than as the Mays' agent. Further, when Mrs. Moore called the Frys to ask them if they would like to counteroffer, she was acting as the buyer's agent and not as the seller's agent. By telling the Mays that the Frys were willing to pay $75,000.00, she acted as the

---

[3]   Mr. Mays did not hear the conversation between the Frys and Mrs. Moore. Tr. at 181-82.

10

Frys' agent because she accepted the Mays' counteroffer on their behalf. At no time did Mrs. Moore ever hold herself out as a person that had binding authority over the Mays. Consequently, the actual conduct of Mrs. Moore does not establish an agency relationship with the Mays. The actions of Mrs. Moore, if they were in violation of the FHA, are not attributable to Mr. and Mrs. Mays under an agency theory.

II    Whether Plaintiffs can prove a *prima facie* case of race-based discrimination on the part of Defendants in violation of The Fair Housing Act.

The Fair Housing Act makes it unlawful for any person to refuse to sell or otherwise make unavailable a dwelling to any person because of race. Meyer v. Holley, 537 U.S. 280, 287 (2003). The purpose of Title VIII is to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. §§ 3601. Under the FHA, courts utilize a three-part test as set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Selden Apartments v. U.S. Dep't of Hous. and Urban Dev., 785 F.2d 152, 159 (6th Cir. 1986). In this framework, the plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence, which if not explained, prove or give rise to an inference of unlawful discrimination. Patterson v. Guttman, 225 F.3d 659, at *5 (6th Cir. 2000). In order to establish a *prima facie* case under the FHA, a plaintiff must show:

> (1) that he or she is a member of a racial minority; (2) that he or she applied for and was qualified to rent or purchase certain property or housing; (3) that he or she was rejected; and (4) that the housing or rental property remained available thereafter.

11

Selden, 785 F.2d at 159.

> If the plaintiff satisfies his burden, the burden of proof shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. Once the defendant satisfies its burden, plaintiff has the opportunity to show by a preponderance of the evidence that the legitimate reasons asserted by the defendant are a pretext.

Patterson, 225 F.3d at *5. Pretext can be shown when a plaintiff demonstrates that a defendant intentionally discriminated against him. Selden, 785 at 159.

In the present case, the parties stipulated that Plaintiffs are members of a protected class because they are black. Plaintiffs have also satisfied the second element, *i.e.*, that they applied for and were qualified to purchase the property, because Mrs. Connell testified at trial that they were pre-approved for a loan in excess of $75,000 and had made an offer to purchase the home for $75,000. Tr. at 65, 87-88. As to the third element, Plaintiffs' offer was rejected in favor of the Frys' offer. Tr. at 83, 425. Finally, although Plaintiffs' bid was rejected on January 27, 2001, at 6:00 p.m. and the Frys' offer was not accepted until 6:35 p.m. on that same day, the property did not remain available because Mr. Mays only rejected Plaintiffs' offer after deciding to accept the Frys' offer. Mr. Mays testified that if the Frys had not made a full-price offer or had not placed the first bid, then it would have been an entirely different situation, tr. at 179, 188, 198-99, *i.e.*, had either of these two factors not been present he would have accepted Plaintiffs' offer. Therefore, the property did not remain available after their offer was rejected.

Thus, Plaintiffs did not establish a *prima facie* case of discrimination because they

failed to prove the fourth element of the <u>Selden</u> test. However, the court will consider whether, assuming that a *prima facie* case was established, Defendants have asserted a legitimate, non-discriminatory reason for rejecting Plaintiffs' offer.

III. <u>Whether Defendants have articulated a legitimate, nondiscriminatory reason for the property having been sold to someone other than Plaintiffs, and if so, whether Plaintiffs have proved that the reason articulated by Defendants is a mere pretext.</u>

Defendants presented evidence at trial of two legitimate, nondiscriminatory reasons for the home at 1181 West Church Street's having been sold to the Frys instead of Plaintiffs. First, Mr. Mays testified that he felt obligated to let the Frys make a counteroffer because they had made the first offer. Tr. at 188. In addition, Mr. Mays stated that his decision was heavily influenced by the fact that the Frys' offer was for the full asking price and that it was a very fair offer. Tr. at 179, 188, 198-99. Second, as to Mrs. Moore's involvement in the bidding process, Mrs. Moore stated that she was motivated by her desire to make a commission rather than to discriminate against Plaintiffs. Tr. at 389, 390, 397. Mrs. Moore was not the listing agent; therefore, she would have only made a commission from the sale at 1181 West Church Street if Mr. Mays sold it to the Frys instead of Plaintiffs. Tr. at 390, 397.

The court finds that these two reasons are legitimate and demonstrate a nondiscriminatory motive for selling to the Frys rather than Plaintiffs. Therefore, under <u>McDonnell-Douglas</u>, the burden shifts back to Plaintiffs to establish that these reasons were merely a pretext for some race-based motivation.

Plaintiffs argue that the following circumstantial evidence gives rise to an inference of discrimination:

A.    Mrs. Moore did not follow Webb Realty policy or procedure.

Plaintiffs argue that Mrs. Moore demonstrated an intent to discriminate based on race because she did not follow Webb Realty policy on numerous occasions. Specifically, Plaintiffs refer to Mrs. Moore's and Mrs. Fry's showing up at the Mays' home without an appointment; Mrs. Moore's phone call to Mr. Mays to tell him that her clients had made a full-price offer on his home; and her visit to the Mays' home to tell Mr. Mays what the proper procedure was when two offers were received. Tr. at 355-56, 367-68, 370-76. It is clear from the evidence presented at trial, however, that Mrs. Moore's motivation was to make a commission rather than to discriminate against Plaintiffs because they are black.

Mrs. Moore stated that she went to 1181 West Church Street with Mrs. Fry on the afternoon of Thursday, January 25, 2001, without an appointment because she was friends and neighbors with the Mays and felt comfortable stopping by. Tr. at 356-57. However, Mrs. Connell did not call Mrs. Lumpkin about the home until Thursday evening–after Mrs. Moore and Mrs. Fry had already dropped by. Tr. at 112-13. Because Plaintiffs had not expressed an interest in the house at the time that Mrs. Moore and Mrs. Fry stopped by without an appointment, her motivation could not have been to discriminate against Plaintiffs because they were not yet known as potential buyers. Clearly, Mrs. Moore was motivated by a desire to earn a commission rather than to discriminate.

14

When Mrs. Moore called Mr. Mays to tell him about the Frys' offer, she testified that she did not know that anyone else was interested in the property or that anyone else was looking at the home. Tr. at 393-94. Mr. Mays told her that a couple was looking at the house; however, Mrs. Moore stated that she was not told the identity of the couple or who their agent was. Tr. 395-96. Mrs. Moore testified that she was not aware that Plaintiffs were interested in the home until she opened the bid on the evening of Saturday, January 27, 2001. Tr. at 393-94. Thus, at the time that she called Mr. Mays about the Frys' offer, she was not acting with a racially discriminatory motive because she was unaware of Plaintiffs' interest in the house.

Finally, when Mrs. Moore went to Mr. Mays' home to tell him of his options, she testified that she did not know the identity of Plaintiffs until after she had read their offer. Tr. at 393-96. Both she and Mr. Mays stated that the race of the persons who were bidding on the home was never discussed at this time. Tr. 198, 396-97. The court finds Mrs. Moore's and Mr. May's testimony credible; thus, Plaintiffs' race was not considered as a factor in determining which offer to accept.

The court finds that Mrs. Moore's alleged violations of Webb Realty policy occurred before she was aware that Plaintiffs were interested in buying the house; therefore, they do not demonstrate an inference of racial discrimination. Further, the evidence demonstrates that once Mrs. Moore became aware of Plaintiffs' interest in the house and that they are black, it was not considered when deciding which offer to accept and which to reject.

15

Consequently, Mrs. Moore's alleged violations of Webb Realty policy were not motivated by race-based discrimination. In addition, since Mrs. Moore's actions were motivated by her desire to earn a commission, it is not necessary to determine whether each of these acts were actually violations of Webb Realty policy because her actions were unrelated to Plaintiffs' race.

      B.     Mrs. Moore prevented black people from buying homes on West Church Street.

Plaintiffs argue that Mrs. Moore prevented black people from buying homes on West Church Street, a street in a predominately white neighborhood. Plaintiffs contend that Mrs. Moore, while acting as their realtor, attempted to dissuade them from purchasing a house in that neighborhood by neglecting to show them homes located at 1302 West Church Street, 1319 West Church Street, 835 West Church Street, and 903 West Church Street.[4] Plaintiffs also argue that the fact that Mrs. Moore lives on West Church Street is evidence that she attempted to prevent black people from moving in.

During trial, Mrs. Moore testified that Plaintiffs told her that they were looking for a four-bedroom house or a house that could be converted to a four-bedroom because they had five children. Tr. at 381. She also stated that Plaintiffs told her that they would like to

---

[4] Mrs. Moore was Plaintiffs' realtor before they decided to work with Ms. Lumpkin. Mrs. Moore stated that she learned that she was no longer Plaintiffs' realtor when she called Mrs. Connell about a house but was told that she had met a black realtor and that they preferred to work with her. Tr. at 392. Mrs. Moore testified that Mrs. Connell was polite and that she was polite in turn. Tr. at 392. Mrs. Connell did not tell Mrs. Moore of any problems that she may have had with Mrs. Moore. Tr. at 392.

live around Alamo, but be out in the country.  Tr. at 383.  Mrs. Moore testified that she showed them many houses that met their specifications and even helped Plaintiffs make an offer on a home on Percy Tucker Road, halfway between the towns of Alamo, Tennessee, and Friendship, Tennessee, which was rejected.  Tr. at 383.  Mrs. Moore also stated that she never refused to show them any homes that they requested to see.  Tr. at 391.  In addition, Mr. Connell stated that he never had any trouble with Mrs. Moore and that she never acted in a discriminatory manner towards him while acting as Plaintiffs' realtor.  Tr. at 436.  Mr. Connell admitted that he did not have any evidence demonstrating that Mrs. Moore discriminated against him because of his race–except for the fact that he and his wife did not get the house on West Church Street.  Tr. at 438, 442.

As to the aforementioned properties for sale on West Church Street, Mrs. Moore testified that she did not present the listing at 1319 West Church Street to Plaintiffs because it was a very small house, it did not have a fourth bedroom, the third bedroom was almost too small to be considered a bedroom, and the dining room could not be converted into a bedroom because it was open to the kitchen.  Tr. at 385.  She further testified that she did not show Plaintiffs the listing at 835 West Church Street because she believed that it was only a two or three bedroom house, and thus, was too small.  Tr. at 385.  Mrs. Moore stated that she did not show Plaintiffs the property at 903 West Church Street because the house was a two-level, the bedrooms were too small, and the ceilings were only five feet tall and were too low for a family with grown children.  Tr. at 386.  In addition, Mrs. Moore testified

that she believes she would have presented Plaintiffs with the listing at 1302 West Church if she thought it fit their needs but could not remember if she had told them about the house or not. Tr. at 384.

Upon consideration of Mrs. Moore's testimony regarding her assessment of Plaintiffs criteria, the court finds that Mrs. Moore legitimately believed that, while acting as their agent, the available homes on West Church Street were inappropriate for Plaintiffs. Finally, it is noted that Plaintiffs presented no evidence that Mrs. Lumpkin had ever shown Plaintiffs any houses on West Church Street prior to the Mays' home--which Ms. Lumpkin only showed upon Mrs. Connell's request.

Mrs. Moore's testimony also rebutted Plaintiffs' claim that she generally dissuaded black people from moving into her neighborhood or that she had any other racial bias. She testified that she had shown Joseph and Sarah Prather, a black couple, a home located 903 West Church Street. Tr. at 386-87. This home was across the street from Mrs. Moore's house and was much closer to her residence than 1181 West Church Street. Tr. at 387. Mrs. Moore testified that she helped the Prathers place an offer on the home, which was accepted, and that she helped them obtain financing. Tr. at 387. Ultimately, the sale was not consummated because the Prathers were unable to get financing. Tr. at 387. Mrs. Moore did, however, help the Prathers purchase a home on Mulberry Street, which she testified was in a predominantly white neighborhood. Tr. at 390.

Mrs. Moore also testified as to her relationship with black people who lived on her

street.  Mrs. Moore stated that her neighbor, Cassie Noles, was a white woman who was previously married to a black man with whom she had children.  Tr. at 388-89.  Mrs. Moore stated that Noles' children came over frequently to play with her grandchildren and that they often went swimming in her swimming pool.  Tr. at 389.

The court finds Mrs. Moore's testimony credible and that she did not attempt to steer Plaintiffs away from purchasing a home on West Church Street because they are black.  In addition, the court finds that Plaintiffs failed to present sufficient evidence that Mrs. Moore exhibited a racial bias against blacks.  Consequently, Plaintiffs have failed to prove that Mrs. Moore's failure to show Plaintiffs homes on West Church Street is circumstantial evidence of pretext.

> C.   Mrs. Moore, while acting as the Frys' realtor, attempted to keep Plaintiffs away from the property at 1181 West Church Street.

Plaintiffs argue that Mrs. Moore attempted to prevent Plaintiffs from seeing 1181 West Church Street because of their race.  Plaintiffs imply that Mrs. Moore discriminated against them because she failed to contact them or Mrs. Lumpkin once she learned that the property was for sale.  Plaintiffs reason that, because Mrs. Moore was once their real estate agent, she owed a duty to inform them whenever a house came on the market that met their criteria and that her failure to do so is circumstantial evidence of race-based discrimination.

Mrs. Moore testified that she learned that the property on 1181 West Church Street

was for sale on Thursday morning, January 25, 2001.[5] Tr. at 356. Mrs. Moore testified that she did not attempt to contact Mrs. Lumpkin or Plaintiffs about the house because Plaintiffs were not her clients at that time and she was not the listing agent of the property, and as a result, she would receive no commission if Plaintiffs purchased the home. Tr. at 390, 392. When she began working with the Frys, Mrs. Moore stated that she was no longer Plaintiffs' realtor. Tr. at 392.

Upon consideration of the record, the court finds that Mrs. Moore did not attempt to prevent Plaintiffs from seeing 1181 West Church Street. Mrs. Moore was under no obligation to tell the Plaintiffs or Mrs. Lumpkin about the property because she was no longer Plaintiffs' realtor. In contrast, her obligation was to her clients, the Frys, and her motivation was to earn a commission. Therefore, Mrs. Moore's failure to tell Plaintiffs about 1181 West Church Street is not circumstantial evidence of race-based discrimination.

> D.   Mr. Mays' statement to Plaintiffs that "[t]his has nothing to do with you folks being black."

Plaintiffs allege that Mr. Mays' statement that "[t]his is not because you folks are black" is evidence that Plaintiffs were, in fact, rejected because they are black. At trial, Mr. Mays testified that after he told Ms. Lumpkin that an offer had been made on the house, Ms. Lumpkin became "agitated" and repeatedly told him that she had tried to set up an appointment for the previous day. Tr. at 175-76. Mr. Mays stated that he felt like Ms.

---

[5] Mrs. Connell admitted during her testimony that, to her knowledge, the home was not for sale when Mrs. Moore was her real estate agent. Tr. at 113.

Lumpkin was accusing him of "deliberately [trying] to keep her out of this house." Tr. at 176. He stated that he then heard a voice behind him say, "'[i]t's because of who we are.'" Tr. at 176. Mr. Mays testified that he was "shocked" and "surprised" by the accusation and, in response, he stated that "[t]his has nothing to do with you folks being black." Tr. at 176.

In contrast, both Mr. and Mrs. Connell stated that nothing was said prior to Mr. Mays' statement.[6] Tr. at 80, 117, 422. However, Mr. Connell's testimony was inconsistent about the chain of events around this time. For example, Mr. Connell first stated that he told Mr. Mays "[t]his is what we want" and "[w]e want the house" before Mr. Mays received Mrs. Moore's phone call about the offer. Tr. at 417. Mr. Connell reiterated this point several times during his direct examination. Tr. at 418, 419, 420, 421. During his deposition, however, Mr. Connell did not state that he told Mr. Mays that he wanted to buy the house before Mr. Mays received Mrs. Moore's call. Tr. at 446; Depo. of John Lewis Connell, at 16. Rather, Mr. Connell stated that he told Mrs. Lumpkin, not Mr. Mays, that he wanted the house. Tr. at 444-46; Depo. of John Lewis Connell, at 16. When asked about this apparent discrepancy, Mr. Connell stated that he told Mr. Mays that he wanted the house before the phone call but that he just didn't mention it while being deposed. Tr. at 446-47. On this point, Mrs. Connell testified that neither she nor Mr. Connell had told Mr. Mays that they wanted to buy the house before Mrs. Moore's phone call. Tr. at 115.

In light of Mr. Connell's discrepancy, as well as the inconsistency between Mr. and

---

[6] Mrs. Connell interpreted Mr. Mays' statement to mean that they were being discriminated against because they are black. Tr. at 117-18.

Mrs. Connell's testimonies, the court finds Mr. Mays' testimony credible. As such, the court finds that the statement that "[t]his has nothing to do with you folks being black" was made in response to an allegation of racial discrimination and that it is not circumstantial evidence of an intent to discriminate against Plaintiffs because they are black.

> E.   Plaintiffs were not given an opportunity to counteroffer and had presented the better offer.

Plaintiffs assert that the fact that they were not given the opportunity to make a counteroffer against the Frys' matching bid is circumstantial evidence of discrimination.[7] However, as stated earlier, Mr. Mays gave the Frys a chance to counteroffer because they were the first party to bid on the property and their offer was for the full asking price.[8] Tr. at 179, 188, 198-99. Unlike the Frys, Plaintiffs had the advantage of knowing that a full-price offer had been submitted. Mr. Mays' failure to offer Plaintiffs a chance to counteroffer is not evidence of race-based discrimination because Mr. Mays was clearly attempting to be fair to both parties. Also, the court notes that Plaintiffs could have made a back-up offer on

---

[7] Plaintiffs frequently refer to Hobson v. Humphreys, 563 F.Supp. 344 (W.D.Tenn. 1982), to support their arguments on this issue. The court has reviewed the Hobson case and finds that it is distinguishable from the present case because the realtor in Hobson gave false information to potential black buyers about the terms and financing available in an effort to dissuade them from being interested in the property. Here, Plaintiffs are not alleging that Defendants presented false information or misrepresented the terms of the deal. A lack of opportunity to counteroffer and lying to potential buyers to make them uninterested are clearly two different issues. Thus, the court declines to consider Hobson as it relates to this issue.

[8] Even Mr. Connell agreed that it was reasonable that a party that sets the first appointment to see a house would have the first opportunity to view the house. Tr. at 447-48. It is also reasonable, therefore, that the party that placed the first offer would have the opportunity to match a later bid for more money.

the property; however, they presented no evidence at trial that such an action was taken.

Plaintiffs also imply that the additional term of a sixty-day close was created by Defendants in order to make the Frys' offer appear more advantageous. Mr. Mays testified that, after he had decided to accept the Frys' bid, he realized that he and his wife needed more time to close because they were moving to Florida and needed to buy a home there.[9] Tr. at 182. In addition, Mr. Mays stated that his son was getting married within the same time frame and that they needed to have an extended closing so that they could participate in the wedding. Tr. at 182.

In the present case, the fact that the Mays' house sold within a few days of being on the market lends believability to Mr. Mays' statement that he had not thought about the logistics of his family's move to Florida or his son's wedding before accepting the Frys' offer. The court finds Mr. Mays' testimony that he did not realize that he needed more time to be credible. In addition, because the extended closing term was decided after the offer was accepted, and for good reason, it played no role in the decision making process. Thus, the term was not fabricated to make the Frys' offer appear more advantageous and it is not evidence of pretext.

Plaintiffs further argue that they had made a more advantageous offer because they were preapproved for financing, while the Frys were not. Plaintiffs' offer stated that their

---

[9] The Frys' offer had originally stated a closing date of February 23, 2001. Ex. 4. Plaintiffs' closing date was listed as February 28, 2001. Ex. 5. However, Mr. Mays did not consider the closing date as a factor while deciding which offer to accept; therefore, the original anticipating closing dates of the Frys and Plaintiffs are of little consequence. Tr. at 182, 185.

23

financing was approved, while the Frys' offer stated that the sales agreement was contingent on obtaining a loan. Ex. 4, 5. However, Mr. Mays testified that he was not aware that Plaintiffs were preapproved for financing and that the Frys were not, therefore, this also played no part in the decision making process and is not evidence of discrimination. Tr. at 183-84.

Conclusion

In conclusion, the court finds that Mr. Webb and Webb Realty are vicariously liable for any illegal actions of Mrs. Moore because she was an employee and an agent of Webb Realty at the time of the alleged violation. The court also finds that no agency relationship existed between Mrs. Moore and Mr. and Mrs. Mays. Thus, if a FHA violation did occur, only Mr. Webb and Webb Realty would be liable for Mrs. Moore's actions under an agency theory.

In regard to the FHA claim, the court finds no evidence in the record demonstrating that Defendants discriminated against Plaintiffs because they are black. Plaintiff have failed to establish a *prima facie* case of discrimination because they failed to prove that 1181 West Church Street remained available after Plaintiffs' offer was rejected. Even if Plaintiffs had made out a *prima facie* case, however, Defendants articulated a legitimate and nondiscriminatory reason for selling the home to the Frys, *i.e.*, Mr. Mays stated that he felt obligated to let the Frys match Plaintiffs' bid because they had made the first offer. In addition, Mrs. Moore testified that her motivation was to make a commission from the sale

24

to the Frys and that she was not motivated by an intent to discriminate against Plaintiffs because they are black. Finally, Plaintiffs have failed to present circumstantial evidence of pretext.

Consequently, as to the issues of contested facts, the court finds that Defendants did not refuse to sell, show, negotiate for the sale of, denial of, availability of, and application of different terms and conditions to the sale of the home at 1181 West Church Street because Plaintiffs are black. The court also finds that Defendants did not interfere with Plaintiffs' right to purchase 1181 West Church Street because of Plaintiffs' race. As a result, the court will not address the issue of damages.

The court concludes that judgment should be entered for DEFENDANTS. The clerk is directed to prepare a judgment in accordance with this order.

IT IS SO ORDERED.

JAMES D. TODD
UNITED STATES DISTRICT JUDGE

6 June 2005
DATE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 116 in case 1:03-CV-01012 was distributed by fax, mail, or direct printing on June 7, 2005 to the parties listed.

---

J. C. Cox
FIELDS & COX
645 N. Royal Street
Jackson, TN 38301--499

Milton Dale Conder
RAINEY KIZER REVIERE & BELL
105 S. Highland Ave.
P.O. Box 1147
Jackson, TN 38302--114

Donald D. Glenn
PENTECOST GLENN & RUDD, PLLC
106 Stonebridge Blvd.
Jackson, TN 38305

Carol Gish
WEST TENNESSEE LEGAL SERVICES, INC.
210 West Main St.
Jackson, TN 38301

Brandon O. Gibson
PENTECOST GLENN & RUDD, PLLC
106 Stonebridge Blvd.
Jackson, TN 38305

Jennifer Craig
WALDROP & HALL
106 S. Liberty Street
P.O. Box 726
Jackson, TN 38302--072

Honorable James Todd
US DISTRICT COURT